# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

ESTATE OF SYDNEY BURKE, et al.    )     CASE NO. 4:13-cv-761

                                         PLAINTIFFS,    )     JUDGE SARA LIOI

vs.    )

MANTUA-SHALERSVILLE FIRE    )     **MEMORANDUM OPINION**
DEPARTMENT, et al.,    )     **AND ORDER**

                                    DEFENDANTS.    )

Before the Court are two motions for summary judgment: the motion of defendant Mantua-Shalersville Fire Department ("MSFD") (Doc. No. 57 ["MSFD Mot."]), and the motion of defendants Matthew Roosa ("Roosa"), Tim Benner ("Benner"), Bill Byers ("Byers"), and Kenneth Justus ("Justus") (collectively, "individual defendants") (Doc. No. 58 ["Ind. Defts. Mot."]). These motions are supported by an Appendix of Documents (Doc. No. 59 ["App."]),[1] as well as numerous deposition transcripts (Doc. Nos. 44-51).[2] Plaintiffs filed a memorandum in opposition to each motion. (Doc. No. 74 ["Pls. Opp'n to MSFD Mot."]; Doc. No. 73 ["Pls.

---

[1] The Appendix includes the following:

    Ex. A      MSFD Policy and Procedures Manual (Doc. No. 59-1 ["PPM"]);

    Ex. B      Affidavit of Timothy Benner (Doc. No. 59-2 ["Benner Aff."]), with three separately submitted audio CDs/DVDs containing interviews of Meagan Heiskell and Chelsea Heiskell (transcripts of which have been provided at Doc. Nos. 68, 69), as well as Sydney Burke's 911 call from April 9, 2011 (no transcript provided), and all other radio traffic relating to this incident;

    Ex. C      Affidavit of Mantua Police Officer Rodney Terry (Doc. No. 59-3 ["Terry Aff."]);

    Ex. D      Affidavit and expert report of Alfred Staubus (Doc. No. 59-4 ["Staubus Report"]); and

    Ex. E      Affidavit and expert report of Donald Cooper (Doc. No. 59-5 ["Cooper Report"]).

[2] The Depositions include: Doc. No. 44 ["Holzman Dep."], Doc. No. 45 ["Justus Dep."], Doc. No. 46 ["Byers Dep."], Doc. No. 47 ["Benner Dep."], Doc. No. 48 ["Roosa Dep."], Doc. No. 49 ["Burkes' Dep."], and Doc. No. 50 [C. Heiskell Dep."] (duplicated, except for attachments, at Doc. No. 51).

Opp'n to Ind. Defts. Mot."].)[3] Defendants filed their respective reply briefs. (Doc. No. 79 ["MSFD Reply"]; Doc. No. 77 ["Ind. Defts. Reply"].) For the reasons set forth herein, both motions for summary judgment are granted.

## I. BACKGROUND

Plaintiffs[4] filed this action on April 5, 2013 against defendant MSFD and four of its employees, the latter being sued both "as employees" (i.e., in their official capacities) and individually. (Doc. No. 1 ["Compl."].)[5] The underlying facts are largely undisputed.

Sydney Burke ("Sydney") was the only child of the Burkes. (Burkes' Dep.[6] at 855.[7]) Sydney, who had a two-year old son, and her friend, Meagan Heiskell ("Meagan"),[8] who was pregnant, decided to live together for support. (*Id.* at 874.) On April 3, 2011, they moved into an apartment at 10735 Elm Street in Mantua. (*Id.* at 876; Compl. ¶ 10.) The structure was a large single family home that had been divided into two apartments; they lived in one of them.

---

[3] Plaintiffs have also submitted a DVD (Doc. No. 75) containing a video recording made by Benner using a camera issued by MSFD. (Benner Dep. at 636.) The camera was aimed at the front porch of the structure (which faced Elm Street, on what is referred to by the firefighters as the "A side"). It captured video of the activity at the scene from that angle, along with audio of the radio transmissions.

[4] Jeff P. and Patricia M. Burke ("the Burkes") brought this action on their own behalf and as co-administrators of the Estate of Sydney Burke. The additional plaintiff, Gregory Michael Truman, brings claims on behalf of his minor son, who was also the son of Sydney Burke.

[5] Plaintiffs also sued Robert Breyley and Kimberly Breyley, as landlords. Despite being served, the Breyleys failed to appear or answer, and this Court granted plaintiffs' motion for default judgment against them as to liability on April 1, 2014. (*See* Doc. No. 33.) The Court indicated that a hearing to determine damages would be set after the other issues in the case were resolved.

[6] Strangely, Jeff and Patricia Burke were deposed together, in a single deposition wherein they both testified. It is not always clear from the transcript which of them is testifying at any given time; sometimes a name is supplied and sometimes the transcript merely identifies the person as "witness." This does not seem to present a problem for any of the parties with respect to their fact recitation, so the Court need not be unduly concerned about this highly unusual deposition.

[7] All page number references are to the page identification number generated by the Court's electronic docketing system.

[8] Since the incident at issue here, Meagan has died, though her death was unrelated to the fire; she was 25 at the time of her death. (C. Heiskell Dep. at 940.) The only available information from Meagan is by way of an unsworn interview conducted on May 28, 2011 by Benner and Lynn Scott as part of the fire investigation. (*See* Doc. No. 68 ["M. Heiskell Interview"].)

After they moved in, the young women discovered that the structure had no "fire detectors." (Burkes' Dep. at 877-78.)

On April 8, 2011, Chelsea Heiskell ("Chelsea"), Meagan's younger sister, came for a spontaneous "sleep over and [to] have a girls night at . . . their new apartment." (C. Heiskell Dep. at 975.) While the three young women sat in the kitchen talking, Chelsea and Sydney shared one drink – a Mike's Hard® Lemonade. (*Id.* at 980.) Meagan did not drink because she was pregnant. (*Id.* at 982.) At some point during the evening, the three decided to go out to the Village Tavern, within walking distance of the apartment. (*Id.* at 982-84.) There, Chelsea and Sydney sat at the bar and drank more alcohol. (*Id.* at 984-86.) The three were there about two hours, and walked back to the apartment after midnight. (*Id.* at 987, 991.)

All three gathered in the kitchen; there was no more drinking. (*Id.* at 991.) After about 30 minutes, Meagan decided to go to bed, and departed for her second-floor bedroom. Chelsea and Sydney stayed in the kitchen for a while. (*Id.* at 992-93.) Chelsea recalls that Sydney was preparing a small, personal-size pizza for herself in the toaster oven on the counter. (*Id.* at 992.) She does not remember seeing Sydney eat the pizza because she went to the living room (on the first floor), where she was going to be sleeping on the couch. (*Id.* at 993-94.) She does recall that Sydney laid down on the kitchen floor while the pizza cooked. (*Id.* at 994-95.) The next thing Chelsea remembers is her sister yelling that there was a fire. (*Id.* at 995.)

The structure fire broke out at the home in the early morning hours on April 9, 2011. (Compl. ¶ 10.) Sydney herself placed the first 911 call at 6:05 a.m. advising that she was in the burning house and asking for help. (Benner Aff. ¶ 4.)[9] During her interview in May 2011,

---

[9] An audio recording of Sydney's 911 call is attached to Benner's affidavit; there was no transcript provided. (App., Ex. B.)

Meagan reported being awakened by smoke and by her sister "screaming up the stairs." (M. Heiskell Interview at 1637.) She walked out of her room and came face-to-face with Sydney in the hallway. (*Id.*)  They made eye contact and Meagan told Sydney to get out. Meagan went back to her own room to get her purse, while Sydney also returned to her bedroom, though Meagan did not know why. (*Id.* at 1638.) Meagan indicated that Sydney appeared confused, perhaps thinking that her son was there (although he was not, having been taken to his father's house for the weekend), and perhaps due to the fact that "she was drinking that night." (*Id.*) Meagan immediately went downstairs to leave the house. She thought Sydney was following; as it turned out, she was not. (*Id.*) When they realized Sydney was not outside, Meagan and Chelsea both made 911 calls. (*Id.* at 1639.) Chelsea also tried to run back into the house to look for Sydney, going first to the kitchen, where she had last seen her. There she saw the flames. (C. Heiskell Dep. at 1000-01.) Meagan also reported that she saw flames in the kitchen. (M. Heiskell Interview at 1639.) Chelsea tried three times to run upstairs for Sydney, but the smoke was too dense, even causing her to black out very briefly. (C. Heiskell Dep. at 1003.)

MSFD was dispatched to the scene,[10] arriving at approximately 6:12 a.m. (Compl., ¶ 11; Terry Aff. ¶ 7.) Three minutes before MSFD's arrival, Mantua police officer Rodney Terry ("Terry") arrived. (Terry Aff. ¶ 4.) He observed the entire first floor heavily engulfed in flames, with fire shooting out the front door, which was wide open. He observed fire in the side and rear of the residence, as well as in the upper rear section of the house. He did not observe any person inside the building attempting to break out, to get air, or to signal for help. (*Id.*, ¶ 5.) Terry approached two females outside the building (apparently Chelsea and Meagan),

---

[10] Chief Roosa testified that the fire station was "[a]pproximately half to three-quarters of a mile[]" from the Elm Street home. (Roosa Dep. at 751.)

who were "excited, hysterical, had lost their composure" and who "offered little information." (*Id.*, ¶ 6.) He gathered that there was someone still inside the building, but the two women could not provide any specific information as to the person's location. (*Id.*) Terry circled the building looking for evidence of a person attempting to signal for help, but he saw none; nor did he hear any screams. (*Id.*) At no time did he observe any sign of life from inside the structure. (*Id.*, ¶ 9.)

The first MSFD engine that arrived at 6:12 a.m. had the three firefighters who were on duty that morning: Justus, Ben Roosa ("B. Roosa"),[11] and Jerod Holzman ("Holzman"). (Justus Dep. at 344, 382; Holzman Dep. at 234.) Terry recognized Justus, who immediately approached. Justus observed two women with Terry, one who was vomiting at the curb, and the other who was standing with Terry. Justus asked the latter whether everyone was out of the house. He reported that she was "hysterical," and the only response Justus could get was "she's upstairs." (Justus Dep. at 347; Terry Aff. ¶ 7.) Justus made the judgment that he "needed to get to work to try to extinguish  the fire[,]" (Justus Dep. at 348), and he directed the other firefighters on the engine to do so. Meanwhile, Terry turned his attention to traffic control and road blocks. (Terry Aff. ¶ 8.)

Justus, who initially was the highest ranking officer at the scene, directed Holzman to begin fighting the fire at the front porch; Benner arrived two minutes later and was told to assist Holzman. (Justus Dep. at 361-62; Holzman Dep. at 237, 243.) They hooked up a hose to the fire engine tank, which contained 500 gallons of water. In the meantime, Justus charged a second water line from the engine tank and attacked the fire from a different angle. Pumping in excess of 150 gallons per minute, they exhausted the engine tank within minutes, and then hooked up to a hydrant. (Justus Dep. at 357-62; Holzman Dep. at 244, 260.)

---

[11] Ben Roosa is not to be confused with Chief Matthew Roosa who is a defendant here.

Within about four minutes, Holzman and Benner knocked down the fire on the front porch and advanced to the front door of the structure. They attempted to extinguish some of the fire inside the door, aiming toward the living room and also toward the stairway leading upstairs. (Holzman Dep. at 249-50, 255.) Holzman testified that "conditions were bad[,]" that "[t]he ceiling was coming down, falling in the living room[,]" that "[t]here was fire already upstairs in the hall[,]" and "[t]he stairs all at the bottom were charred." (*Id*. at 255-56.) Justus came to the front door to observe and noted that "there was fire traveling the ceiling[,]" "in the walls[,]" "behind the outlets[,]" and "in the corner near the stairs traveling the walls." (Justus Dep. at 391.) Justus, Benner, and Holzman all were of the opinion that the staircase was structurally damaged and it was not safe to attempt a rescue by climbing those stairs. Justus ordered them to stay out of the structure and to continue spraying water from the front doorway. (Justus Dep. at 391-92; Holzman Dep. at 255-57, 281, 284; Benner Dep. at 647.)

Justus proceeded around the back of the house and discovered another stairway to the second floor. He did not know at that time that it was the stairway to the second apartment, with no access to Sydney's apartment. (Justus Dep. at 370-71.) Justus summoned Holzman and the two proceeded up those stairs to attempt a search for Sydney, without the protection of a hose line. (*Id*. at 387.)

MSFD Chief Roosa arrived several minutes after the first engine and took over the command. (Roosa Dep. at 768-71.) When he observed flames shooting out of the roof and parts of the roof collapsing, he ordered Justus and Holzman to exit the structure. Nevertheless, moments later, Justus, Holzman and Byers again entered via the rear stairway. Byers testified that he had "no visibility[,]" "fire above [his] head[,]" "did not have a hose line[,]" and had

6

"debris and objects falling hitting" him. There were "obstacles on the floor[.]" "[I]t was a bad interior fire condition." (Byers Dep. at 530.)

Firefighters from other departments had begun to arrive on the scene and Roosa directed them to perform specific tasks, such as a "vent-enter-search" through windows on the second floor. (Roosa Dep. at 802.) After several attempts, Byers finally located Sydney; he broke out a window, reached in, and felt what he believed to be a foot. (Byers Dep. at 539-40.) Although there was still fire above, in the roof, he crawled through the window and into the room. (*Id.* at 543.) Sydney's face was covered and she had debris on her. Byers checked for a pulse and observed her chest to see if she was breathing. He saw smoke stains on her face and her arms were above her head. He found no pulse and saw no signs of breathing. (*Id.* at 543-44.) Byers was "positive she was dead." (*Id.* at 546.) Lieutenant Bobek from the Streetsboro Fire Department also checked and confirmed that Sydney was dead. (*Id.*)

Byers reported to Roosa directly that he had found Sydney and that she was dead. (*Id.* at 547-48.) Since they were "35, 40 minutes into this," and "could . . . have a crime scene[,]" Roosa directed him to "leave her in place," to "protect in place." (Roosa Dep. at 814-15.)

Although there is no sworn testimony at this juncture regarding the cause of Sydney's death, the report of Alfred E. Staubus, defendants' expert in pharmaceutical chemistry,[12] notes as follows:

> B.  The Summit County Medical Examiner's autopsy records include a "Final Diagnoses" of (I) smoke inhalation, (II) ethyl alcohol intoxication, and (III) obesity, body mass index 37.8 kg/m$^2$. The autopsy records also state that soot (black, finely granular material) was found on [Sydney's] body and within her trachea, main stem bronchi, and the parenchyma of the lungs. Postmortem blood

---

[12] Staubus holds a Doctor of Pharmacy (1971) and a Ph.D. in pharmaceutical chemistry (1974) from the University of California, San Francisco. (App., Ex. E at 1571.) Plaintiffs have offered no challenge to Staubus's credentials as an expert.

7

analysis indicated that Sydney Burke had a serum-alcohol concentration of 0.177 g/dL and carboxyhemoglobin level of 67%.

(App., Ex. E at 1576.) This statement has not been opposed or contradicted by plaintiffs.

In their complaint, plaintiffs attack the activities of the fire department and the individuals at the scene, alleging that they "failed to establish any type of command[ ]" (Compl. ¶ 19); "failed to muster a crew and attempt any rescue" (*id.* ¶ 20); at 6:16 a.m., when the fire was darkened at the front porch, "failed to immediately enter the structure and attempt rescue efforts for the known victim trapped inside" but worked "in a lackadaisical manner without fervor and aggressiveness that reasonable and prudent firefighters would have demonstrated" (*id.* ¶ 21); upon locating Sydney, "failed to immediately remove her body and/or attempt any life-saving efforts[ ]" (*id.* ¶ 22); and "failed to provide adequate training" which is a "systematic deficiency" (*id.* ¶ 23).

## II. DISCUSSION

### A.    Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material

fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

**B.     Analysis**

     *1.     Section 1983 Claim*

     The only federal claim raised by plaintiff is in Count III, wherein they allege:

> Defendant Mantua-Shalersville Fire Department, while acting under color of state law, exhibited a systematic and persistent failure in its hiring, training, supervision, and retention of firefighters. These acts and/or omissions deprived Sydney Burke, Jeff Burke, Patricia Burke, and Ronald Jeffery Truman of their rights and liberties secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

(Compl. ¶ 35.) Notably, there is no § 1983 claim against any of the individual defendants. Therefore, only MSFD has moved for summary judgment on this claim.

     MSFD argues in its motion that plaintiffs cannot establish the necessary elements of a § 1983 claim for four reasons: (1) a "failure to train" claim cannot stand upon a single, isolated instance because that is insufficient to establish a custom or policy of MSFD, and, further because the record shows that MSFD did properly hire, train, supervise, and retain its firefighters; (2) MSFD did not subject Sydney to loss of life, liberty or property because her peril

was caused, not by an affirmative act or failure of MSFD, but by the fire in her home; (3) MSFD did not deprive Sydney of procedural or substantive due process because its actions were not arbitrary, unreasonable, or conscience-shocking, in a constitutional sense; and (4) no equal protection claim under the Fourteenth Amendment can be supported by the allegations in the complaint.[13]

Title 42, Section 1983 "creates a private right of action to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. Under the terms of the statute, every person who acts under color of state law to deprive another of a constitutional right [is] answerable to that person in a suit for damages." *Rehberg v. Paulk*, -- U.S. --, 132 S. Ct. 1497, 1501-02, 182 L. Ed. 2d 593 (2012) (internal quotation marks and citations omitted). "[T]o succeed on a claim under 42 U.S.C. § 1983, plaintiff must show that defendants' constitutional violation caused decedent's injury." *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 910 (6th Cir. 1995). But a political subdivision, such as MSFD, "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A plaintiff must establish that "the [governmental entity] itself is the wrongdoer." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992).

Plaintiffs base their § 1983 claim against MSFD entirely on a theory of "a systematic and persistent failure in [MSFD's] hiring, training, supervising, and retention of firefighters[,]" which was "reckless, willful, and/or wanton[.]" (Compl. ¶¶ 35, 36.) In opposition to MSFD's motion, plaintiffs assert: "Since Sydney's death was directly and proximately caused

---

[13] By virtue of the counter arguments in their opposition brief, plaintiffs have clarified that they are attempting to raise a substantive due process claim under the Fourteenth Amendment. (*See* Pls. Opp'n to MSFD Mot. at 2018.) Therefore, the Court need not further consider any Fourteenth Amendment procedural due process or equal protection claims.

by the MSFD's official policies and/or tolerances of the aforementioned customs, it is clear that she was deprived of her life. That deprivation fits squarely within the meaning of the substantive due process clause of the 5th Amendment incorporated to the States through the 14th Amendment." (Pls. Opp'n to MSFD Mot. at 2018.) Although the Supreme Court has held that a governmental entity can, in some circumstances, be held liable under § 1983 "for constitutional violations resulting from its failure to train municipal employees[,]" *Canton v. Harris*, 489 U.S. 378, 380, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989),[14] an essential prerequisite to any such liability is a constitutional violation. *Hunt v. Applegate*, No. 5-1062, 1996 WL 428399, at *2 (6th Cir. July 30, 1006) ("Obviously, the first thing required is a constitutional event, i.e., an underlying constitutional violation that the failure to train causes. Bad facts or a single outrageous event is insufficient.")

"The [Fourteenth Amendment Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). The Supreme Court has "recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196 (citations omitted). "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes

---

[14] In the context of failure to train police officers, the Sixth Circuit has noted the Supreme Court's holding that "'the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (quoting *Canton v. Harris*, 489 U.S. at 388). "Proving deliberate indifference for failure to train 'typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures.'" *Id.* (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005)).

harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

That said, "[e]ven though the Due Process Clause does not generally impose affirmative duties upon the state to protect [life, liberty and property], in certain situations the Constitution does impose an affirmative duty of care and protection." *Sargi*, 70 F.3d at 910 (citing *DeShaney*, *supra*). The Sixth Circuit has recognized two such situations: "(1) the 'custody' or 'special-relationship' exception, and (2) the 'state-created danger' exception." *Willis v. Charter Twp. of Emmett*, 360 F. App'x 596, 599 (6th Cir. 2010) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)). Neither applies here, and plaintiffs, in any event, make no such argument. Sydney was not in MSFD's custody in any sense of that word, *Id*. at 600 (decedent "was restrained by the circumstances of the car accident, not by the defendants' actions[]"), nor was there any special relationship between them, *Sargi*, 70 F.3d at 911 ("[a] special relationship can only arise when the *state* restrains an individual[]") (emphasis in original), nor did MSFD create the danger Sydney was in, *id*. at 913 ("[d]ecedent's medical condition, not the Board or its employees, created decedent's peril[]"); *see also DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf.") (citation omitted).

Here, plaintiffs fail to establish any Fourteenth Amendment substantive due process violation. MSFD did not deprive Sydney of her life. The unfortunate and tragic circumstances of the fire in her home did that. In light of that fact, from a constitutional standpoint, the legitimacy, appropriateness, and/or advisability of any of MSFD's policies with respect to hiring, training, supervising, and retention of firefighters is irrelevant because no

matter how good (or bad) those policies may be, they cannot be said to have resulted in a constitutional violation for any of the plaintiffs.[15]

Accordingly, MSFD is entitled to summary judgment with respect to the sole federal claim in Count III of the complaint.

### 2.  *State Law Claims*

Plaintiffs also raise several state law claims, variously against only MSFD, against only the individual defendants, or against all defendants (in addition to claims against the Breyleys, who are the defaulting landlords). In their separate motions for summary judgment, MSFD and the individual defendants assert that they are entitled to immunity and, therefore, to summary judgment on the state law claims.

### a.  *Immunity of MSFD*

"The process of determining whether a political subdivision is immune from liability involves a three-tiered analysis." *Elston v. Howland Local Sch.*, 865 N.E.2d 845, 848 (Ohio 2007) (citation omitted). "The first tier provides a general grant of immunity, stating that 'a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.'" *Id.* (quoting Ohio Rev. Code § 2744.02(A)(1)). The statute "provides nearly absolute immunity to political subdivisions in order to limit their exposure to money damages." *Sabulsky v. Trumbull Cnty., Ohio*, No. 2001-T-0084, 2002 WL 31886686, at *2 (Ohio Ct. App. Dec. 27,

---

[15] In their brief in opposition to MSFD's motion, plaintiffs go on at some length about all that is purportedly wrong with the various challenged policies. (*See* Pls. Opp'n to MSFD Mot. at 2019-23.) But plaintiffs merely *assume*, without any support or argument, that there is a constitutional violation simply because Sydney lost her life. Fourteenth Amendment case law does not support that assumption.

2002). "The second tier in an immunity analysis focuses on the exceptions to immunity located in [Ohio Rev. Code §] 2744.02(B)." *Elston*, 865 N.E.2d at 849.

MSFD argues that, applying the first two tiers of the analysis described above, it is entitled to immunity. There is no dispute, at the first tier, that MSFD is a "political subdivision" under Ohio Rev. Code § 2744.01(F) and that fire-fighting is a "governmental function" within the meaning of Ohio Rev. Code § 2744.01(C)(2). (MSFD Mot. at 1351; Pl. Opp'n to MSFD Mot. at 2007.) But plaintiffs skip the second tier analysis, arguing in opposition that MSFD does not enjoy immunity because its decisions relative to use of equipment, supplies, materials, personnel, facilities and other resources were at least reckless within the meaning of Ohio Rev. Code § 2744.03(A)(5). (Pl. Opp'n to MSFD at 2007.) Before it can address plaintiffs' opposing argument with respect to the availability of a statutory defense, the Court must examine, even if plaintiffs did not, the potential applicability of the statutory exceptions to immunity in the second tier of the analysis. In fact, if no exception applies, the analysis properly ends at that point because MSFD would then enjoy the general grant of immunity.

The first statutory exception to immunity involves injury or damages "caused by the negligent operation of any motor vehicle by [the political subdivision's] employees when the employees are engaged within the scope of their employment and authority." Ohio Rev. Code § 2744.02(B)(1). The facts in this case do not implicate this exception to immunity. The second exception pertains to "the negligent performance of acts by [the political subdivision's] employees with respect to proprietary functions of the political subdivision[]." Ohio Rev. Code § 2744.02(B)(2). The statute itemizes various "proprietary functions," none of which apply here. *See* Ohio Rev. Code § 2744.01(G)(2). The third exception involves "negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads[.]" §

14

2744.02(B)(3). This exception has no applicability here. The fourth exception pertains to liability caused by negligence of employees occurring "within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function[.]" § 2744.02(B)(4). This exception is inapplicable. Finally, the last exception applies "when civil liability is expressly imposed upon the political subdivision" by another Ohio statute. § 2744.02(B)(5). Plaintiffs have pointed to no specific Ohio statute imposing liability.

Since none of the five exceptions to immunity have been established, plaintiffs cannot proceed with their state law claims against MSFD, and there is no need to consider defendant's alternative arguments relating to available defenses in "the third tier of the analysis, [where] immunity may be reinstated if a political subdivision can successfully assert one of the defenses to liability listed in [Ohio Rev. Code §] 2744.03." *Elston*, 865 N.E.2d at 849 (citation omitted); *see Nelson v. City of Cleveland*, No. 98548, 2013 WL 588718, at *4 (Ohio Ct. App. Feb. 14, 2013) ("courts do not engage in the third tier of the analysis regarding available [statutory] defenses . . . if no [statutory] exception . . . can be found to remove the general grant of immunity[]") (citing *O'Toole v. Denihan*, 889 N.E.2d 505, 516 (Ohio 2008) (declining to engage in the third-tier analysis with respect to a political subdivision where no statutory exception to immunity applied)).[16]

---

[16] Here, MSFD claims that, if it has lost immunity at the second tier (which it correctly denies), two of the statutory defenses apply to reinstate its immunity, specifically the defenses in Ohio Rev. Code § 2744.03(A)(3) and (A)(5). Section (A)(3) provides that immunity is restored to the political subdivision "if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee." Section (A)(5) restores immunity if the injury or loss "resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." Plaintiffs do not oppose MSFD's argument with respect to subsection (A)(3), addressing only subsection (A)(5), and arguing in opposition to the motion that "despite Defendant's blanket argument(s) that the

Because there is no applicable statutory exception to MSFD's immunity, it is entitled to summary judgment on all of plaintiffs' state law claims.[17]

       b.     *Immunity of the Individual Defendants*

In their separate motion for summary judgment, the individual defendants assert entitlement to immunity under Ohio Rev. Code § 2744.03(A)(6), which provides:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
>
>                ***
>
> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

---

Plaintiffs lack evidence establishing at least recklessness in this regard, the facts, evidence, and testimony suggest otherwise." (Pl. Opp'n to MSFD Mot. at 2012.) Plaintiffs assert, therefore, that this creates a genuine issue of material fact for a jury. As already noted, MSFD has no obligation to provide evidence in support of any affirmative defense if, as here, no statutory exception to immunity applies. Even so, defendant argued persuasively in its reply brief that any lost immunity would be restored under Ohio Rev. Code § 2744.03(A)(3) because all of the acts that plaintiffs challenge are discretionary acts. (MSFD Reply at 2058-59, citing *Tadijanac v. Jefferson Twp. Bellville Fire Dep't*, Nos. 14CA20, 14CA24, 2014 WL 4823848, at *8 (Ohio Ct. App. Sept. 26, 2014) (agreeing that "standard operating procedures and decisions on what equipment to put on its trucks were discretionary actions with regard to policy making, planning and enforcement powers in the use of the [Fire] Department's equipment and resources").)

[17] To the extent the complaint sets forth two claims of loss of consortium (Counts VI and VIII), those claims, being derivative, cannot survive against MSFD if the underlying claims do not survive. *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992) (recognizing that "a claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the [person] who suffers bodily injury[]").

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

The individual defendants assert that there is no dispute that MSFD is a "political subdivision," that fire-fighting is a "governmental function," and that they, as individuals, were all acting within the scope of their employment. They assert that plaintiffs cannot meet their burden of proving that any of the individual defendants acted "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" (Ind. Defts. Mot. at 1379-81.)

In support of their motion, the individual defendants assert that Sydney "was in a position of peril and at a substantial risk to lose her life before the MSFD ever arrived on the scene." (*Id.* at 1383.) They argue that audio tapes, video footage, and deposition testimony all confirm that she was already experiencing respiratory distress during her 911 call to MSFD. They further argue that there is no evidence that Sydney was even alive or capable of being rescued when MSFD arrived on the scene. In their view, all evidence suggests that she had already died before MSFD arrived. They claim they have presented undisputed evidence that Sydney "did not respond to verbal questions, attempt to escape, attempt to alert the fire department of her location, and had already died before the MSFD ever arrived on the scene." (*Id.* at 1384, citing App., Ex. C, ¶¶ 6, 9; Ex. D, ¶ 7; Ex. E, ¶ 6.) The individual defendants further argue that "their mere effort of fighting the fire and attempting a rescue is sufficient to negate a claim of recklessness." (*Id.*) Finally, they argue that plaintiffs cannot meet their burden of establishing proximate cause, having left unopposed both defendants' experts' conclusions that Sydney died before the firefighters arrived on the scene. They argue that, "[a]bsent any evidence

establishing that [Sydney] was alive when the Firefighters arrived, and that the actions of the Firefighters caused her death, Plaintiffs cannot possibly establish proximate cause or a nexus between the Firefighters [sic] conduct and Ms. Burke's death." (*Id.* at 1386.)

Plaintiffs argue in opposition that the individual defendants acted recklessly in several respects, resulting in Sydney's death. (Pl. Opp'n to Ind. Defts. Mot. at 1976.) They do not advance any theory of maliciousness or bad faith, and the Court, therefore, need not address any arguments as to those two theories contained in the individual defendants' motion.

"Distilled to its essence, and in the context of [Ohio Rev. Code §] 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk." *O'Toole*, 889 N.E.2d at 517 (citations omitted). "Recklessness, therefore, necessarily requires something more than mere negligence." *Id.* (citing *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994)). "'[T]he actor must be conscious that his conduct will in all probability result in injury.'" *Id.* (quoting *Fabrey*, 639 N.E.2d at 35). "Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity." *Id.*

Plaintiffs assert generally that "due to [MSFD and the firefighters] having insufficient manpower, insufficient water supply, ineffective incident control system(s), and inadequate training, Sydney Burke perished in the fire." (Pl. Opp'n to Ind. Defts. Mot. at 1972.) They argue that, due to these various insufficiencies, defendants could not "attempt a successful rescue of Sydney Burke." (*Id.* at 1977-78.)  "While Sydney Burke was in peril by virtue of being trapped inside the building during the fire, the Defendants' actions and omissions in this case substantially and unjustifiably increased Sydney Burke's risk of harm by failing to have any

18

policies and/or procedures in place to even attempt an effective rescue of the decedent." (*Id.* at 1978.)

MSFD's role is not relevant. The only question for this motion for summary judgment is whether the individual defendants were reckless, as defined by Ohio law. If they were not, they are entitled to statutory immunity.

Notwithstanding pages of argument about all the alleged "insufficiencies," plaintiffs have made no attempt to explain how any of these individual defendants could be personally held responsible for the alleged insufficient manpower, insufficient water supply, ineffective incident control, or inadequate training. Plaintiffs attribute every one of these "insufficiencies" to MSFD, not to any of these individuals.

More importantly, plaintiffs fail to refute or challenge in *any* way, much less in a way sufficient to raise a material factual dispute for purposes of summary judgment, the following evidence, which is the most compelling evidence available. Defendants' expert, Alfred E. Staubus, reached the following ultimate conclusion:

> In summary, it is my opinion to a reasonable degree of scientific and medical probability that (1) because of the combined result of her 0.150 g/dL blood-alcohol concentration and the 67% carboxyhemoglobin level from inhaling high concentrations of carbon monoxide, *Sydney Burke died* within a few minutes of calling 911 at 6:05:52 a.m. on April 9, 2011, *prior to the arrival of the Mantua-Shalersville Fire Department* at 6:12 a.m. on April 9, 2011, and (2) Sydney Burke's loss of critical judgment in making the 911 call from inside the house rather than from outside the house is consistent with the Excitement Stage of Alcoholic Influence associated with a 0.150 g/dL blood-alcohol concentration.

(App., Ex. E at 1577, italics added.) Plaintiffs have failed to refute defendants' assertion that Sydney was incapable of being rescued from the peril that *they* did not create (i.e., the fire)

19

because she had already died by the time they arrived on the scene.[18] No matter what the individual defendants did (or arguably did not) do, and even if all of the alleged "insufficiencies" are taken as true, plaintiffs have failed to raise any material factual dispute surrounding the expert's conclusion that the tragic result would have been the same and would not have been caused by any actions or omissions of the individual defendants. Put another way, even if there had been hundreds of highly trained firefighters, with millions of gallons of water available, and a highly effective and efficient incident control system, that would not have led to a different result, since the unrefuted fact is that Sydney had, unfortunately and tragically, already expired by the time the fire department arrived. Plaintiffs cannot demonstrate the requisite recklessness to destroy the individual firefighters' statutory immunity. The individual defendants are, therefore, entitled to summary judgment on plaintiffs' state law claims.

### III. CONCLUSION

For the reasons set forth above, the motion for summary judgment of defendant Mantua-Shalersville Fire Department (Doc. No. 57) is **GRANTED** and the motion for summary judgment of defendants Matthew Roosa, Tim Benner, Bill Byers, and Kenneth Justus (Doc. No. 58) is **GRANTED**. As to all of these defendants, judgment will be entered in their favor.

One final matter must be separately addressed. As already noted, plaintiffs named as defendants in this lawsuit Robert Breyley and Kimberly Breyley, who were Sydney's landlords. In addition to loss of consortium claims (Counts VI and VIII), and an extreme and outrageous conduct claim (Count VII), the complaint specifically asserts a claim of negligence against the Breyleys for their failure to maintain the Elm Street home by not installing smoke

---

[18] There is not even the slightest hint in any of the pleadings or motions papers that plaintiffs are alleging that MSFD failed to arrive on the scene in a timely manner.

detectors despite requests (Count IV), and a claim for spoliation based on their alleged willful destruction of evidence relating to the fire investigation (Count V). Although served, neither of the Breyleys made an appearance in the case and, on April 1, 2014, this Court granted plaintiffs' motion for default judgment against each of them, indicating that a hearing to determine damages would be set after all other issues in the case were first resolved. Now that such resolution has occurred, the Court will entertain plaintiffs' written suggestions as to how to proceed with respect to the Breyleys. Plaintiffs' submission must be filed by March 30, 2015.

**IT IS SO ORDERED**.

Dated: March 23, 2015

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**